UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
PATRIA VELEZ,

                        Plaintiff,

          -against-

CAROLYN W. COLVIN, Acting
Commissioner, Social Security Administration,

                        Defendant.
-------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

14 Civ. 1953 (KMK)(JCM)

To the Honorable Kenneth M. Karas, United States District Judge:

      Plaintiff Patria Velez ("Plaintiff") commenced this action pursuant to 42 U.S.C.

§ 405(g), challenging the decision of the Commissioner of Social Security ("the

Commissioner"), which denied Plaintiff's application for disability insurance benefits, finding

her not disabled.  Presently before this Court are:  (1) Plaintiff's motion to reverse the

Commissioner's decision or, in the alternative, vacate such decision and remand for further

consideration by the Commissioner, pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure ("Rule 12(c)"), (Docket No. 14); and (2) the Commissioner's cross-motion for

judgment on the pleadings to affirm the Commissioner's decision pursuant to Rule 12(c),

(Docket No. 16).  For the reasons below, I respectfully recommend that Plaintiff's motion should

be denied and that the Commissioner's cross-motion should be granted.

## I. BACKGROUND

      Plaintiff was born on October 20, 1965. (R.[1] 316).  From 1997 to 2004, she was self-

employed as a babysitter and cleaning houses. (R. 317).  From July 1, 2008 until January 2010,

---

[1] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social security benefits, filed in this action on October 14, 2014. (Docket No. 11).

she worked as a Home Attendant. (R. 329). On July 16, 2010, Plaintiff filed a disability insurance benefits application, alleging that she became disabled and was unable to work as of January 20, 2010 as a result of surgery that she had on her right and left feet. (R. 321, 378). The Social Security Administration ("SSA") denied Plaintiff's application on September 22, 2010. (R. 83). Plaintiff appealed the denial and, on January 30, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Maria Mandry. (R. 45-61). The hearing was adjourned because Plaintiff's counsel was unprepared and there was no interpreter available. (R. 60-61). On January 8, 2013, Plaintiff testified before ALJ Patrick Kilgannon. (R. 62-80). On January 23, 2013, ALJ Kilgannon affirmed the denial of benefits, concluding that Plaintiff was not disabled. (R. 32-40). The Appeals Council subsequently denied Plaintiff's request for review on January 17, 2014. (R. 1-4). Thereafter, Plaintiff appealed the SSA's decision by filing the present action on March 20, 2014, (Docket No. 1), contending that the ALJ's decision was based on errors of law and was not supported by substantial evidence in the record.

## A.  Plaintiff's Medical Treatment History

The administrative record contains medical records from treatment that Plaintiff has received for her feet, back, neck, and shoulder pain, as well as for sleep apnea.

## 1.  Dr. P. Joshi and other Foot-Related Records

The administrative record reflects that Plaintiff sought medical treatment for her foot pain from Dr. Pradip Joshi ("Dr. P. Joshi"), a podiatrist, from September 29, 2009 to December 23, 2011. (R. 478-510). Dr. P. Joshi's notes from 2009 indicated that Plaintiff was suffering from painful bunions, with limited range of motion and tenderness. (R. 510). Dr. P. Joshi performed a bunionectomy on Plaintiff's right foot on January 21, 2010. (R. 507). Dr. P. Joshi's notes following the surgery, from February 1, 2010, February 17, 2010, March 9, 2010, March 23,

2010, March 31, 2010, April 9, 2010, and April 14, 2010 noted plaintiff's symptoms of

tenderness, swelling, limited range of motion, soreness and mild edema. (R. 500-06).

On April 20, 2010, Dr. P. Joshi performed a bunionectomy on Plaintiff's left foot. (R.

497-98). Immediately following the second surgery, Dr. P. Joshi's notes indicated that Plaintiff

was experiencing tenderness and edema in the left foot. (R. 496).  On April 28, 2010, Dr. P.

Joshi completed a supplementary report for temporary disability benefits and wrote that he

believed Plaintiff would be able to return to work on June 14, 2010. (R. 438).  On July 9, 2010,

Dr. P. Joshi noted that Plaintiff was experiencing some swelling, and also stated that she had

missed her last appointment. (R. 493).  On this same date, Dr. P. Joshi completed a

supplementary report for temporary disability benefits and indicated that it was his assessment

that Plaintiff would be able to return to work on August 16, 2010. (R. 437).

On July 30, 2010, Plaintiff reported to Dr. P. Joshi that she felt better than before, but still

complained of swelling and pain off and on in her left foot. (R. 492).  Dr. P. Joshi noted that

Plaintiff's x-ray showed that the screw from the surgery was in position, and explained the

possibility of a delayed union in her healing. (R. 492).  On July 20, 2010, Dr. P. Joshi prescribed

an ankle brace.[2] (R. 491).  On August 10, 2010, Dr. P. Joshi again noted that Plaintiff had missed

her earlier appointment and showed up three hours late for the rescheduled appointment. (R.

490).  On August 24, 2010, Plaintiff reported that she felt better, and Dr. P. Joshi noted that she

had satisfactory range of motion on the left side. (R. 488).  On October 19, 2010, Dr. P. Joshi

indicated that an x-ray showed that Plaintiff's osteotomy was completely healed and said that her

---

[2] A Disability Report completed by SSA interviewer V. Burgos during an in-person interview with plaintiff on July 16, 2010 contains the observation that Plaintiff was wearing "some type of cast on her left foot" and was unable to wear shoes on her right foot. (R. 375).

edema and tenderness were gone, although Plaintiff still complained of pain sometimes. (R. 485-86).

On November 10, 2010, Plaintiff arrived at her appointment with Dr. P. Joshi wearing high heel dress shoes. (R. 483). Dr. P. Joshi noted no edema or tenderness, and wrote that Plaintiff's feet had healed from the bilateral bunionectomy. (*Id.*). According to Dr. P. Joshi's notes, Plaintiff explained that she still had pain, and that she had to stand at her prior job for many years, so it was "better [that she] stay home and take care of [her] foster kid." (*Id.*). Plaintiff told Dr. P. Joshi that she wanted to apply for permanent disability benefits. (*Id.*). Dr. P. Joshi said that he could not "do that," but indicated that Plaintiff could seek a second opinion. (*Id.*). On November 16, 2010, Dr. P. Joshi wrote that Plaintiff had healed bilateral bunion surgery. (R. 484). He also made a note regarding Plaintiff returning to work, but it is partially illegible. (*Id.*). Notes from December 2010 and January 2011 stated that Plaintiff was feeling better, but was also experiencing arthritis as a late effect of the surgery, and Dr. P. Joshi referred her to physical therapy.[3] (R. 481-82).

In March and June 2011, Plaintiff complained to Dr. P. Joshi of back pain and received two local back injections, which she reported helped her. (R. 479-80). Dr. P. Joshi also referred Plaintiff to physical therapy for her back pain. (*Id.*). The last record, from December 23, 2011, indicated that Plaintiff had pain and neuropathy in her left foot, but that it was secondary to her back pain. (R. 478). Her x-ray showed that the surgery sites on her feet were healed. (*Id.*).

Dr. P. Joshi completed two medical assessments of Plaintiff's ability to do work-related activities. (R. 467-69, 471-73). In the first assessment, completed on June 24, 2011, he wrote

---

[3] Plaintiff indicated on a disability report in December 2010 that she had been unable to go to physical therapy because of a lack of insurance. (R. 412). Plaintiff contends that this was the reason for her non-compliance with later-scheduled physical therapy appointments as well.

that Plaintiff could lift and/or carry about one pound because of her radiculopathy pain in her back, both lower extremities, and her feet. (R. 467). Dr. P. Joshi noted that Plaintiff was going for physical therapy. (*Id.*). He also said that she could stand and/or walk for about 1.5 hours in an eight-hour work day because of the radiculopathy burning pain in both feet, and could sit for two hours in an eight-hour day and for two hours without interruption because of her prolapse disc and tingling and numbness in her lower extremities. (R. 468). He assessed that she also had limitations in climbing, stooping, kneeling, balance, crouching, and crawling based on his medical findings of tingling, numbness, and burning pain in her lower extremities and feet. (*Id.*). He also indicated that Plaintiff's neuropathy would affect the work activities that Plaintiff could do. (R. 469). The assessment completed on December 23, 2011 contains similar conclusions, with Dr. P. Joshi stating that Plaintiff suffered from a neuropathy disorder, a prolapse disc in her back, and radiculopathy burning, numbness, and pain from her back to her lower extremities and feet. (R. 471-73).

Dr. P. Joshi also completed a medical source statement on April 24, 2012. (R. 597-603). He reported that Plaintiff had radiating, burning pain in both feet, with reduced range of motion, sensory changes, tenderness, and swelling in both lower extremities. (R. 597). He indicated that it was his assessment that Plaintiff had a severe limitation in her ability to deal with work stress, that she had experienced an upset stomach as a side effect to her medications, that she could sit for fifteen minutes continuously before having to alternate postures, that she had to elevate both of her legs while sitting to minimize her pain, and that she could only sit, stand, or walk about for a total of about two hours in a day. (R. 598-600). He reported that she used a cane to assist with walking and standing. (R. 600). He assessed that she could never lift one to five pounds, balance

or stoop. (R. 602).  He wrote that she would likely be absent from work more than three times

per month because of her impairments or treatment. (R. 603).

## 2. Records Regarding Plaintiff's Back, Neck, and Shoulder Pain

Plaintiff saw Dr. Tricia Chan at the Bronx-Lebanon Hospital Center on September 16,

2009 and had an x-ray done of her lumbar spine. (R. 448).  The x-ray showed mild rotatory

scoliosis of the thoracolumbar spine and a somewhat rounded and bulbous L2 spinous process.

(*Id.*).  The thoracic kyphosis and lumbar lordosis were normal. (*Id.*).  Plaintiff saw Dr. Chan

again for a pre-operation evaluation on January 13, 2010, prior to the surgery on her right foot.

(R. 444).  Dr. Chan's notes stated that Plaintiff had tenderness in her lumbar spine, and negative

straight leg raise bilaterally at that appointment. (R. 446).  Plaintiff had a CT scan of her lumbar

spine on January 26, 2010. (R. 442).  The CT scan revealed scoliosis, a congenital deformity in

the level opposite upper margin of L2 vertebra with an oblique interlaminar cleft between the

laminae and oblique direction of the spinous process towards the right side. (*Id.*).  The CT scan

also showed a tiny calcific disc spot at the posterior margin of L1-L2 disc. (*Id.*).  The remaining

segments of the lumbar spine appeared unremarkable. (*Id.*).  Plaintiff saw Dr. Chan for a follow-

up appointment on March 2, 2010 regarding the abnormalities found in the x-ray of her L-spine.

(R. 441).  She reported her right bunion surgery, as her foot was still in a cast and in pain at the

time. (*Id.*). In the assessment and plan section of Dr. Chan's notes from that appointment, she

wrote that Plaintiff had increased blood pressure and was therefore advised of lifestyle changes

and weight loss, that Plaintiff should follow up with podiatry, and that she was due to have a

mammogram in February 2011. (R. 443).  There was no reference to treatment for her back pain.

Plaintiff initially saw a physical therapist at Bronx Lebanon Hospital Center on February

4, 2011 to be evaluated and treated for neck pain. (R. 522).  At that appointment, she reported an

aching and throbbing pain in her neck and upper back, which she described as a seven to eight out of ten on the pain scale. (*Id.*).  She said that she was able to get out of bed independently, and perform chores and go shopping with "maximal assistance." (*Id.*).  She received physical therapy for the neck pain on February 16, 2011, (R. 530), and March 7, 2011, (R. 531).  She failed to attend scheduled physical therapy appointments on February 22, 2011 and February 26, 2011. (R. 529).

On March 22, 2011, Plaintiff saw Francisco Santiago, MD, in the physical therapy department at Bronx Lebanon Hospital Center and reported that she wanted to shift her physical therapy to address the pain she was experiencing in her back and feet. (R. 533).  Dr. Santiago noted that Plaintiff was in no acute distress and that her gait was functional. (*Id.*).  She had decreased flexion on bending over, with her fingertips reaching her knees, and some tenderness to palpation over her S1 region. (*Id.*).  Her lower extremity strength was good and she was able to raise both straight legs to eighty degrees. (*Id.*).  Her back injury was evaluated by the physical therapist on April 15, 2011, at which appointment Plaintiff reported that her back pain was a burning pressure, nine out of ten on the pain scale, and was aggravated by sitting and standing too long. (R. 536).  Following this evaluation, Plaintiff missed two physical therapy appointments on April 20, 2011 and April 25, 2011. (R. 529).  She received physical therapy on April 27, 2011, May 2, 2011, May 18, 2011, and May 23, 2011. (R. 540).  The record contains notes from Dr. Santiago dated May 3, 2011 and May 24, 2011, in which he reported that Plaintiff was not in acute distress, that her gait was functional, that she was feeling "somewhat better" and had experienced some relief from the physical therapy, but still experienced decreased flexion and tenderness in her back. (R. 546, 549).  On May 3, 2011, she said that she was not able to stand on her toes and heels because of her bunion surgeries. (R. 546).

Plaintiff's neck pain was again evaluated on June 24, 2011 by a physical therapist. (R. 556). She reported that the pain felt like pressure, throbbing, and fatigue, and that it was aggravated by lifting/carrying. (*Id.*). Plaintiff missed three physical therapy appointments in July. (R. 529). On July 15, 2011, she reported to Dr. Santiago that she had not been able to attend the missed appointments, but that she would like to restart the physical therapy, especially for her lower back. (*Id.*). Again, he noted that she was in no acute distress and that her gait was functional. (*Id.*). Unlike at earlier appointments, Plaintiff could stand on her toes and heels, as well as on one leg at a time. (*Id.*). She had increased lumbar lordosis and some tightness in her paravertebral muscles. (*Id.*). Dr. Santiago's impression was that Plaintiff had lower back pain syndrome. (*Id.*). The record does not indicate whether Plaintiff received any treatment in August, but she returned to see Dr. Santiago on September 13, 2011, and he again wrote that she was interested in beginning physical therapy for her lower back pain. (R. 570).

Plaintiff was evaluated for lumbago on September 15, 2011 by the physical therapist, and she reported that her back pain was a nine out of ten, pressure pain, that she could only sit for ten to fifteen minutes and stand for fifteen minutes. (R. 566). She received physical therapy treatment for her lumbago symptoms on September 23, 2011, September 27, 2011, October 7, 2011, and October 14, 2011. (R. 567). On October 4, 2011, the physical therapist's notes stated that Plaintiff had "noted improvement in her back." (R. 573). In addition to the physical therapy, Plaintiff received local injections of Xylocaine in her back on November 22, 2011, and bupivacaine on January 4, 2012 and February 21, 2012. (R. 576, 577, 585). She reported that these injections were helpful. (R. 577, 585). The last appointment with the physical therapist for treatment of the lumbago symptoms was on February 22, 2012. (R. 518, 587).

### 3. Plaintiff's Sleep Apnea Records

Jeanne Damian, M.D. evaluated Plaintiff for sleep apnea on December 11, 2012. (R. 616).  Plaintiff presented with symptoms of loud snoring, witnessed apneas, and excessive daytime sleepiness. (*Id.*).  Dr. Damian also wrote that Plaintiff had a past medical history for obesity, hypertension, asthma, and nasal allergies. (*Id.*).  Dr. Damian's impression was that Plaintiff's sleep efficiency was decreased, and she noted severe sleep disordered breathing, which led to transient arousals such that Plaintiff's sleep was significantly fragmented. (*Id.*).  She diagnosed Plaintiff with severe obstructive sleep apnea and recommended use of a Continuous Positive Airway Pressure machine ("CPAP machine"). (*Id.*).  She also recommended weight loss, avoidance of alcohol, especially near bedtime, and avoidance of activities requiring vigilance when excessive sleepiness was present. (*Id.*).  Dr. Damian evaluated Plaintiff again on December 15, 2012 to assess the efficacy of the CPAP machine. (R. 611).  She noted that with the use of the machine, Plaintiff's sleep efficiency increased to ninty-three percent, which was within a normal range. (*Id.*).  She stated that this was a successful study, with most respiratory events eliminated with the CPAP regimen. (*Id.*).  Dr. Damian recommended that Plaintiff continue to use the CPAP machine. (*Id.*).

### B. Consulting Physicians

The administrative record contains evaluations by two consulting physicians.

### 1. Dr. D. Joshi

Dr. Dipti Joshi, MD ("Dr. D. Joshi") examined Plaintiff in September 2010. (R. 456-59). Dr. D. Joshi noted Plaintiff's medical history, including the bunionectomy of her right foot in January 2010 and of her left foot in April 2010. (R. 456).  Plaintiff described the pain in her left foot as an eight out of ten, pinching and sharp, and said that it was better with medication and

worse with walking. (*Id.*).  She also reported arthritis in her lower back causing pain that she described as punching, and sharp, nine out of ten, and which was made worse with lifting. (*Id.*). She said that the pain in her back was not radiating. (*Id.*).  She reported that her activities of daily living included cooking three times a week with help, cleaning and laundry once a week with help and childcare seven days a week. (*Id.*).  Dr. D. Joshi found Plaintiff had no acute distress and a normal gait, although she declined to walk on her heels or toes because of her recent surgery. (R. 457).  She squatted to about twenty-five percent. (*Id.*).  She had a mild limp without the use of a cane, and used a cane for weight bearing because of the pain in her left great toe. (*Id.*).  She wore a special boot on the left foot that she received post-surgery. (*Id.*).  She needed no assistance changing for the exam or getting on or off the examination table. (*Id.*).  She was able to rise from the chair without difficulty. (*Id.*).  Her cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (R. 457-58).  Dr. D. Joshi found no scoliosis, kyphosis, or abnormality in her thoracic spine.  Her lumbar spine showed decreased flexion/extension to sixty degrees, but she had full range of motion in her shoulders, elbows, forearms, hips, knees, and ankles bilaterally. (R. 458).  She declined to move her left great toe because of pain and a numbing sensation. (*Id.*).  She had decreased sensation around the scar on her left toe. (*Id.*). Dr. D. Joshi diagnosed Plaintiff with recent left bunionectomy with left toe pain, history of right bunionectomy, and history of low back pain with arthritis in her lower back. (*Id.*).  Dr. D. Joshi opined that Plaintiff had mild limitations for walking, climbing, and standing, moderate limitation for bending, and marked limitations for squatting. (*Id.*).

**2. Dr. M. Eggleston**

Dr. M. Eggleston provided a Physical Residual Functional Capacity Assessment on September 17, 2010. (R. 460-65).  Dr. Eggleston diagnosed Plaintiff with scoliosis, lumbago, and bunions. (R. 460).  He found that she could occasionally lift and/or carry twenty pounds, could frequently lift and/or carry ten pounds, could stand and/or walk for six hours in an eight hour work day, could sit for a total of six hours in an eight hour work day, and could push and pull without limitation. (R. 461).

**C. Plaintiff's Testimony during January 8, 2013 Hearing before ALJ Kilgannon**

Plaintiff testified through a Spanish interpreter at the January 8, 2013 hearing before ALJ Kilgannon. (R. 64-80).  Plaintiff testified that she lived with her husband and two children, ages 16 and 13. (R. 68).  She said that her last job was as a home attendant, ending in January 2010. (*Id.*).  Regarding her feet, she testified that she had bunion surgery in 2010, and that her last physical therapy session was the previous year. (R. 70).  When asked about her back, she stated that she last had physical therapy in October or November, (*Id.*), and that she used to get injections in her back every month, (R. 72).  She told the ALJ that her daily activities were limited; she mostly went to the doctor and to church on Sundays. (R. 71).  She said that her daughter did the cooking and her husband cleaned the house, that she was able to dress herself, but that someone had to observe her while she was doing it. (*Id.*).  To explain why she was so limited in her daily activities, she said that she would get tired and lose her balance, and that she always had pain in her feet. (R. 71-72).  When questioned by her attorney, Plaintiff reported that she didn't have a specific limit to how long she could sit before needing to change positions, but that "sometimes it [could] be two minutes, five minutes." (R. 73).  Regarding her sleep apnea,

Plaintiff testified that it was severe and that she had been using the CPAP machine for a month. (R. 74).

The vocational expert Pat Green testified after Plaintiff. (R. 75). ALJ Kilgannon asked Ms. Green to consider the following hypothetical: an individual of the same age, education and work experience as Plaintiff, with the Residual Functional Capacity ("RFC") for light work[4] and additional postural limitations of no climbing ladders, ropes, or scaffolds, who could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, had no manipulative limitations, but should avoid exposure to hazards such as moving machinery or unprotected heights. (R. 77). With that hypothetical person in mind, Ms. Green testified that such a person could not perform Plaintiff's past work. (R. 78). She instead named three jobs in the local, regional, or national economy that such a person could perform: assembler of small products, hand packager, and garment sorter. (Id.). ALJ Kilgannon then asked what the effect would be if the person could only lift up to one pound, and would not be able to work a full-time, eight-hour workday, 40-hour work week, and Ms. Green confirm that those symptoms would preclude all employment. (Id.). Plaintiff's representative additionally inquired as to the effect of a person being off task more than ten percent of a workday in addition to any breaks, and Ms. Green confirmed that that would preclude employment as well. (R. 79).

## II.  THE ALJ'S DECISION

The ALJ applied the five-step approach in his January 23, 2013 decision. (R. 32-40). At the first step, the ALJ found that Plaintiff had not engaged in "substantial gainful activity since January 20, 2010, the alleged onset date." (R. 34). At the second step, the ALJ determined that

---

[4] ALJ Kilgannon clarified that this entailed lifting up to 20 pounds occasionally, lifting or carrying up to 10 pounds frequently, standing or walking for approximately six hours per eight-hour workday and sitting for approximately six hours per eight-hour workday, with normal breaks. (R. 77).

Plaintiff had the following severe impairments: status-post bilateral bunion surgery, back pain, and sleep apnea. (*Id.*). At the third step, the ALJ held that Plaintiff did not have a medically determinable impairment or a combination of impairments that were listed in "20 C.F.R. Part 404, Subpart P, Appendix 1." (*Id.*).

The ALJ then determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with the further limitation that she could not climb ladders, ropes or scaffolds. (*Id.*). ALJ Kilgannon noted that Plaintiff could "occasionally climb ramps or stairs, occasionally balance, stoop, kneel, crouch and crawling." (R. 34-35). He also found that she should "avoid exposure to hazards such as moving machinery and unprotected heights." (R. 35).

In determining Plaintiff's RFC, the ALJ held that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. (*Id.*). The ALJ discussed Plaintiff's hearing testimony, in which she stated that she stopped working at a home health aid in January of 2010 because of back pain, arthritis, neck pain, and shoulder pain. (*Id.*). He noted that she underwent bilateral bunionectomies, and complained of ongoing foot and leg pain, and sleep apnea, for which she used a CPAP machine. (R. 35). The ALJ also stated that although Plaintiff claimed to be able to sit for only two to five minutes at a time, "she sat comfortably through the hearing." (*Id.*).

The ALJ specifically noted his "careful consideration of the evidence." (*Id.*). Regarding Plaintiff's foot symptoms, the ALJ discussed Plaintiff's treatment history with Dr. P. Joshi, who performed her bilateral bunionectomies, and his inconsistent estimations as to when Plaintiff would be able to return to work. (R. 35-36). With respect to Plaintiff's back, neck, and shoulder symptoms, ALJ Kilgannon examined the evidence of Plaintiff's x-ray and CT scan in 2009 and 2010, the treatment notes and evidence of physical therapy from 2011, and the evidence that she

received trigger point injections for her low back pain. (R. 36-37). The ALJ also briefly discussed Plaintiff's sleep apnea, noting that a CPAP machine had been prescribed, but concluded that "as the claimant has just started treatment for sleep apnea, there is no indication that it cannot be properly treated or [will result] in a severe impairment that would be expected to last for a continuous period of twelve months or longer." (R. 37).

Regarding opinion evidence, the ALJ said that he gave "little weight" to Dr. P. Joshi's assessment that Plaintiff could not carry more than a pound, could only sit for a total of two hours due to back pain, would need to keep her feet elevated during the day, and would likely miss more than three days of work per month. (*Id.*). He justified this conclusion by pointing out that Dr. P. Joshi's opinions discussed medical impairments that were not supported by the record, his recent notes showed infrequent treatment, and his treatment notes following Plaintiff's operations showed limited and conservative care. Additionally the ALJ noted that Dr. P. Joshi's assessments were inconsistent with his treatment notes that said that Plaintiff's feet were completely healed and that she was ready to return to work. (R. 37-38).

Regarding the consulting examiner Dr. D. Joshi's report, the ALJ stated that he gave significant but not controlling weight to Dr. D. Joshi's assessment that Plaintiff had mild limitations in walking, climbing and standing, marked limitation in squatting, and moderate limitation in bending. (R. 38). The ALJ supported his conclusion by noting Plaintiff was examined by Dr. D. Joshi shortly after her bunionectomy and, therefore, refused to do some of the tests because of subjective complaints. (*Id.*). The ALJ said that Plaintiff showed poor compliance with physical therapy and was seen infrequently for treatment. (*Id.*). He also pointed out that recent treatment notes show that Plaintiff had a normal gait, that she was seen recently for lower back pain but did not appear to have ongoing neck or feet complaints, and that she

appeared to have relatively busy activities of living, including performing childcare, going to church, and assisting with household chores. (*Id.*).

At the fourth step, the ALJ determined that Plaintiff was not capable of performing her past relevant work as a home attendant, child monitor, or cleaner/housekeeper. (*Id.*). The ALJ noted that Plaintiff was not able to communicate in English and was, therefore, considered illiterate in English. (*Id.*). At the fifth step, the ALJ found that Plaintiff's ability to perform all or substantially all of the requirements of light work was impeded by her limitations and, therefore, consulted a vocational expert to determine whether jobs existed in the national economy that Plaintiff could perform. (R. 39). Based on the vocational expert's testimony that an individual with Plaintiff's age, education, work experience, and RFC would be able to perform jobs such as assembler of small products, hand packager, and garment sorter, the ALJ concluded that Plaintiff was not disabled. (*Id.*).

## III. DISCUSSION

Plaintiff argues that the ALJ's decision is erroneous as a matter of law and is not supported by substantial evidence. Specifically, Plaintiff maintains that the ALJ erred by: (1) not properly applying the treating physician rule; (2) improperly substituting his own judgment for that of Plaintiff's physicians; (3) failing to develop the record regarding why Plaintiff declined to seek additional treatment for her symptoms; (4) and failing to consider Plaintiff's use of a cane, side effects to medications, and obesity, in determining Plaintiff's RFC. (Docket No. 15). Additionally, Plaintiff maintains that if the ALJ had not made the above-listed errors, he would have found that Plaintiff was at least restricted to sedentary work and, therefore, the Medical Vocational Guidelines would direct a finding of disability based on Plaintiff's age and illiteracy in the English language. (*Id.*).

## A.  Legal Standards

A claimant is disabled and entitled to disability benefits if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "'and bears the burden of proving his or her case at steps one through four.'" *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (citation omitted).

## B.  Standard of Review

When reviewing an appeal from a denial of Social Security benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g).  The Court does

not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quotation marks and citations omitted). If the findings of the Commissioner are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The substantial evidence standard "is still a very deferential standard of review—even more so than the 'clearly erroneous' standard. The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault*, 683 F.3d at 448 (emphasis in the original) (quotation marks and citations omitted). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149 (citation omitted). Even if there is evidence on the other side, the Court defers "to the Commissioner's resolution of conflicting evidence." *Cage*, 692 F.3d at 122 (citation omitted).

However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quotation marks and citation omitted).

## C. The Treating Physician Rule

At step four in the disability analysis, the ALJ must first determine the applicant's RFC. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). In determining an applicant's RFC, the

ALJ must apply the treating physician rule, which requires the ALJ to afford controlling weight to the applicant's treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2). Thus, "'[a] treating physician's statement that the claimant is disabled cannot itself be determinative.'" *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)). Moreover, if there is substantial evidence in the record that contradicts or questions the credibility of a treating physician's assessment, the ALJ may give that treating physician's opinion less deference. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (refusing to give controlling weight to treating physicians' opinions, as they were not supported by substantial evidence in the record); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (same); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (same).

To discount the opinion of a treating physician, the ALJ must consider various factors and provide a "good reason." 20 C.F.R. § 404.1527(c)(2)-(6). These factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency with the record as a whole; (5) the specialization of the treating physician; and (6) other factors that are brought to the attention of the Court. *See Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

The Second Circuit has made clear that the ALJ need not "slavish[ly] recit[e] . . . each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Molina v. Colvin*, No. 13 Civ. 4701(GBD)(GWG), 2014 WL 2573638, at *11 (S.D.N.Y. May 14, 2014) (collecting cases).

What is required, however, is that the ALJ provide "good reasons" when not affording controlling weight to a treating physician's opinion. *Selian*, 708 F.3d at 419 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); 20 C.F.R. § 404.1527(c)(2)); *see also Petrie*, 412 F. App'x at 407 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)) ("[W]here 'the evidence of record permits [the Court] to glean the rationale of an ALJ's decision, [the Court] do[es] not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'").

Plaintiff contends that the ALJ erred in not giving controlling weight to Dr. P. Joshi's June 24, 2011, December 23, 2011, and April 24, 2012 assessments of Plaintiff's impairments. (Docket No. 15).  This argument is unpersuasive.  Dr. P. Joshi concluded that Plaintiff was able to lift and/or carry about one pound, could stand and/or walk for about 1.5 hours and sit for about two hours in an eight-hour day, and had limitations in climbing, stooping, kneeling, balance, crouching, and crawling. (R. 467-68).  In 2012, he added that Plaintiff could sit for only fifteen minutes continuously before having to alternate positions, and that she would likely be absent from work more than three times per month. (R. 598-600, 603).  ALJ Kilgannon made clear that he accorded little weight to these assessments because they relied on medical impairments that were not supported by the record, including a prolapsed disc in Plaintiff's back and bilateral neuropathy. (R. 37).  Additionally, the ALJ found that these assessments were inconsistent with objective evidence contained in the record that showed that Plaintiff's feet were completely healed, that Dr. P. Joshi provided limited and conservative care following Plaintiff's surgeries, and that Plaintiff required only infrequent treatment in recent months. (R. 37-38). Dr. P. Joshi's treatment notes do not support the conclusion contained in his assessments of Plaintiff's RFC. In

particular, Dr. P. Joshi's notes contain very little to substantiate his assessment of Plaintiff's back symptoms. Moreover, Dr. P. Joshi was Plaintiff's treating podiatrist. Additionally, regarding Plaintiff's foot complaints, ALJ Kilgannon correctly noted that Dr. P. Joshi's treatment notes contained substantial evidence that Plaintiff's feet had healed. (R. 483). Finally, Dr. P. Joshi's limited treatment in 2012, along with the shift in Plaintiff's focus at physical therapist appointments away from treatment of foot symptoms, further substantiate the ALJ's conclusion to give limited weight to Dr. P. Joshi's assessment. The ALJ had adequate reasons to discount Dr. P. Joshi's assessment and did not err by not giving Dr. P. Joshi's assessment controlling weight.

## D. The ALJ's Judgment

Plaintiff argues that ALJ Kilgannon substituted his own judgment for that of Plaintiff's treating physicians in two ways. First, he concluded that Plaintiff's sleep apnea could be properly treated and was, therefore, not likely to last for a continuous period of twelve months. (Docket No. 15). Second, when he discredited Plaintiff's testimony regarding her ability to sit for only two minutes based on his perception of her comfort level when sitting during the hearing. (*Id.*).

The ALJ, as the trier of fact, is responsible for weighing all evidence and resolving any evidentiary conflicts. *Richardson*, 402 U.S. at 399. However, "he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (alterations in original). Plaintiff's argument that the ALJ substituted his own judgment for that of Plaintiff's physician in determining that Plaintiff's sleep apnea did not constitute a disability is unpersuasive. Plaintiff's medical records indicated that the CPAP machine, prescribed to her on December 11, 2012, increased Plaintiff's sleep efficiency to normal levels and eliminated most respiratory events originally caused by the

sleep apnea. (R. 611). ALJ Kilgannon's determination that Plaintiff's sleep apnea was controlled by this treatment and was unlikely to last for a continuous period of twelve months, the definition of a disability under the regulations, was based on the medical judgment of Plaintiff's physician. This is a proper exercise of the ALJ's discretion in determining whether Plaintiff's impairments meet the statutory definition of disability based on the credible evidence in the record. *See* 20 C.F.R. § 404.1527(d)(1) (opinions of whether a claimant meets the statutory definition of a disability are not considered medical opinions under the regulations, and are left to the Commissioner).

Additionally, Plaintiff contends that the ALJ erred by substituting his own medical opinion when he discredited Plaintiff's testimony that she could only sit for two to five minutes because he found that she sat comfortably throughout the hearing. (Docket No. 15). Although the ALJ's observations of apparent pain or discomfort during a hearing is afforded limited weight, it is not an improper consideration in assessing a claimant's credibility. *See Carroll v. Secretary of Health and Human Servs*, 705 F.2d 638, 643 (2d Cir. 1983) ("ALJ's observation that [the claimant] sat through the hearing without apparent pain, being that of a lay person, is entitled to but limited weight . . . .") (abrogated on other grounds); *Rivera v. Schweiker*, 717 F.2d 719, 724 (2d Cir. 1983) (giving ALJ's observations at the hearing limited weight in evaluating the claimant's credibility). ALJ Kilgannon made his determination regarding Plaintiff's credibility based on the entire record. (R. 35). In addition to his observation of Plaintiff's comfort during the hearing, he also relied on treatment notes indicating that Plaintiff was not in acute distress, (R. 37), Dr. D. Joshi's assessment that Plaintiff's limitation for sitting was mild, (R. 38), her relatively busy activities of living, (*Id.*), and her inconsistent physical therapy

records, (R. 37). It was not an error to consider his impression of the Plaintiff during the hearing, among these other factors, even though this impression is only entitled to limited weight.

**E. The Duty to Develop the Record**

Plaintiff also contends that the ALJ erred in factoring Plaintiff's noncompliance with physical therapy in his assessment of her credibility without further developing the record on why Plaintiff missed these scheduled appointments. The ALJ has an affirmative obligation to develop the record due to the nonadversarial nature of the administrative proceeding. *Burgess*, 537 F.3d at 128 (citations omitted). However, if "there are no obvious gaps in the administrative record, and the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting *Perez*, 77 F.3d at 47). Furthermore, regarding the ALJ's consideration of a claimant's compliance with prescribed treatment, the SSA's policy guidance instructs that the adjudicator not "draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7P (S.S.A.), 1996 WL 374186, at *7 (July 2, 1996). Here, Plaintiff reported on a Disability Report in 2010 that she was unable to attend physical therapy because of her lack of insurance. (R. 412). Additionally, Plaintiff explained to Dr. Santiago that she "was not able to attend" the missed appointments. (R. 559). The ALJ was under no obligation to further develop the record regarding other possible explanations for Plaintiff's nonattendance at several physical therapist appointments. It was within his discretion to make a credibility determination with the

information before him.[5] *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (the ALJ "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.") (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979)).

## F. The ALJ's Consideration of Plaintiff's Use of A Cane, Side Effects of Medications, and Obesity

Plaintiff maintains that the ALJ failed to consider Plaintiff's use of a cane, side effects of her medications, and obesity in his determination in violation of the regulations. (Docket No. 15). For the following reasons, this argument is unpersuasive.

The regulations set forth the factors that the Commissioner will consider in determining the nature and severity of a claimant's impairment(s). These factors include:

> (i) [The claimant's] daily activities; (ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms; (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of [] pain or other symptoms; (vi) Any measures [the claimant] use[s] or ha[s] used to relieve [] pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). In determining that Plaintiff had an RFC for light work with the additional postural limitations, the ALJ noted his consideration of the entire record, and specifically discussed Dr. D. Joshi's notation that Plaintiff used a cane and wore a boot on her left foot on September 7, 2010, as well as notes from 2011 that state that Plaintiff was not using

---

[5] Plaintiff also notes that ALJ Kilgannon erroneously reported that Plaintiff did not attend any physical therapy appointments following October 14, 2011. (R. 37). The record does contain evidence of Plaintiff attending physical therapy appointment for lumbago on February 22, 2012, which conflicts with the ALJ's statement that Plaintiff's physical therapy ended in 2011. (R. 518, 587). Despite ALJ Kilgannon's error regarding the last date of Plaintiff's physical therapy, it is clear from his decision that he did consider physical therapy records surrounding Plaintiff's lumbago symptoms, as he explicitly discusses them. (R. 37). Additionally, Plaintiff's contention that the record conclusively shows that Plaintiff received physical therapy twelve times in March and April 2012 goes too far, as the record shows only that she made appointments on those dates, and not that she appeared and received treatment. (R. 606-07). In either case, any error that ALJ Kilgannon made in summarizing Plaintiff's physical therapy treatment history was harmless.

an assistive device. (R. 36).  The ALJ also indicated that Plaintiff's gait was assessed as functional on a number of occasions.[6]  As such, it cannot be said that ALJ Kilgannon did not consider Plaintiff's use of an assistive device in his decision.

Regarding the ALJ's consideration of the side effects that Plaintiff experienced as a result of her medication, there is no indication in the record that Plaintiff suffered from such side effects.  The only mention of side effects in the record is in the medical source statement from Dr. P. Joshi, dated April 24, 2012, in which he reported that Plaintiff had experienced an upset stomach as a side effect to her medications. (R. 598-600).  As this assessment is entirely unsupported by Dr. P. Joshi's treatment records, which contain no mention of side effects, it was not an error for the ALJ to decline to give this assessment controlling weight. *Halloran*, 362 F.3d at 32 (refusing to give controlling weight to treating physicians' opinions, as they were not supported by substantial evidence in the record).  Plaintiff's argument regarding the ALJ's failure to consider her obesity fails for the same reason.  Aside from two passing mentions of the benefits of weight-loss as it related to Plaintiff's rising blood pressure and sleep apnea, (R. 443, 616), the record does not contain substantial evidence that Plaintiff suffered from obesity as an impairment.  Plaintiff points out that the medical record dated January 14, 2012 reflected that Plaintiff was 57 inches tall and weighed 147 pounds. (R. 578).  Plaintiff uses that information to calculate her Body Mass Index ("BMI"), noting that the resulting 31.8 is an indication of obesity. (Docket No. 15) (citing

https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm).  While obesity is considered a medically determinable impairment that the ALJ must consider in determining a

---

[6] Plaintiff points to a physical therapy note from September 15, 2011 that indicated that Plaintiff used a straight cane. (R. 566).  However, other physical therapy records from 2011 and 2012 do not indicate use of such an assistive device. (R. 522, 530, 531, 536, 542, 543, 544, 556, 571, 572, 573, 574, 575, 587).

claimant's limitations, *see Devora v. Barnhart*, 205 F. Supp. 2d 164, 175 (S.D.N.Y. 2002), a Plaintiff's own post-hearing self-diagnosis of the condition does not create an obligation for the ALJ to consider the impairment to a greater extent than what he has already done in evaluating the record as a whole. *See Sindoni v. Colvin*, No. 3:14-CV-0633 (GTS), 2015 WL 3901955, at *8 (N.D.N.Y. June 25, 2015) (finding that the ALJ had no obligation to consider an impairment where there was no diagnosis of such impairment other than plaintiff's self-diagnosis). Therefore, I find that the ALJ properly assessed the relevant factors in determining Plaintiff's limitations.

## G. Substantial Evidence

Aside from how the ALJ's consideration of the evidence relates to the legal arguments addressed above, Plaintiff does not contend that the ALJ's determination is not supported by substantial evidence in the record. Nonetheless, I have reviewed the record and find that substantial evidence supports the ALJ's determination that Plaintiff had an RFC to perform light work, with the further limitations noted. I will first address Plaintiffs' foot impairments. X-ray records and Dr. P. Joshi's treatment records from October 19, 2010, November 10, 2010, November 16, 2010, and December 23, 2011 contain substantial evidence that Plaintiffs' feet had healed following her bilateral bunionectomy. (R. 478, 484-86). When Plaintiff continued to complain of pain in her feet she was referred to physical therapy, after which she showed improvement and was able to stand on her toes and heels, as well as on one leg at a time. (R. 559). Dr. Santiago's diagnosis from July 2011 does not indicate any impairments in her feet. (*Id.*). Turning to Plaintiff's back and neck impairments, numerous treatment records stated that Plaintiff was not in acute distress and that she had a normal or functional gait. (R. 533, 546, 549, 559). Her symptoms of pain and tightness were treated with limited physical therapy sessions

and local injections in 2011. (R. 567, 576-77, 585). This record is consistent with Dr. D. Joshi's evaluation that Plaintiff had mild limitations for walking, climbing, and standing, and supports the ALJ's RFC determination. (R. 458). Finally, as discussed in Section D, *supra*, the ALJ did not err in relying on Plaintiff's physician Dr. Damian's conclusion that the CPAP machine was "very effective in ameliorating [Plaintiff's] sleep disordered breathing." (R. 611). In sum, substantial evidence supports the ALJ's determinations regarding Plaintiff's RFC.

As I find no legal errors warranting remand, and substantial evidence supports the ALJ's determinations, I find that the ALJ did not err in determining that Plaintiff retained an RFC for light work with the additional limitations detailed in his January 23, 2013 decision. As such, I will not reach the issue of whether the Medical Vocational Guidelines would direct a finding of disability based on Plaintiff's age and illiteracy in the English language if the ALJ had found Plaintiff to have an RFC for only sedentary work.

## IV. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that Plaintiff's motion for judgment on the pleadings should be denied and the Commissioner's cross-motion should be granted.

## V. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Kenneth M.

Karas at the United States District Court, Southern District of New York, 300 Quarropas Street,

White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Kenneth

M. Karas and not to the undersigned.  Failure to file timely objections to this Report and

Recommendation will preclude later appellate review of any order of judgment that

will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v.*

*Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   April 19, 2016
         White Plains, New York

                                **RESPECTFULLY SUBMITTED,**

                                JUDITH C. McCARTHY
                                United States Magistrate Judge